Filed 4/4/13  P. v. Ruiz CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JAMES RUIZ,<br><br>        Defendant and Appellant. | B238485<br><br>(Los Angeles County<br>Super. Ct. No. GA083697) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Suzette Clover, Judge.  Reversed and remanded.

Maureen L. Fox, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and Tasha G. Timbadia, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant James Ruiz of corporal injury to a spouse. (Pen. Code, § 273.5, subd. (a) (count 1).)[1] The jury found Ruiz not guilty of assault by means likely to produce great bodily injury. (§ 245, subd. (a)(1) (count 2).) In a bifurcated trial, the jury found Ruiz had suffered four prior convictions (§ 667.5, subd. (b)), one of which was a prior conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d)). Ruiz was sentenced to 12 years in state prison, consisting of the upper term of four years, doubled pursuant to the Three Strikes Law, plus one additional year for each of the four prior prison term convictions.

Ruiz contends on appeal that the trial court erred by (1) failing to hold an adequate *Marsden*[2] hearing in which the court questioned Ruiz about his dissatisfaction with appointed counsel; (2) denying Ruiz's midtrial motion to represent himself; (3) admitting evidence of prior bad acts; and (4) instructing the jury that Ruiz had a motive to commit the charged offenses. Ruiz further contends that the cumulative effect of these errors requires reversal of his conviction. As we agree with the first contention, we reverse the judgment and remand the matter to the trial court. Because after holding an appropriate *Marsden* hearing on remand the judgment could be reinstated, we proceed to consider the remaining contentions raised by Ruiz on appeal and find no further error.

# FACTUAL AND PROCEDURAL BACKGROUND

## I. Prosecution Evidence

### A. Current crime

Olga Marquez and her son and two daughters lived in North Hollywood along with Marquez's brothers. Marquez had been married to Ruiz for 16 years but he lived in

---

[1] All further undesignated statutory references are to the Penal Code.

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

Burbank with his mother and brother. On July 4, 2011, she and her daughters, Lydia (16 years old and Ruiz's daughter with Marquez) and her half-sister Danielle (11 years old), went to Ruiz's home. Marquez called Ruiz when they arrived at his home and he came downstairs. He asked to talk to Marquez alone and they went upstairs while the girls stayed in the car. After awhile, the girls heard their mother call for help. Lydia told Danielle to go see what was happening; Lydia did not want to go because Ruiz tended to be aggressive. Danielle walked to a place where she could see Marquez and Ruiz. She could not hear what Ruiz was saying but she saw her mother crying and heard her telling Ruiz not to hurt her. Ruiz's hands were on Marquez's shoulders. Danielle told Lydia what she had seen and then returned to the stairs but her mother and Ruiz were not there.

Marquez testified that Ruiz had taker her cell phone a few days before the incidents at issue here. When they went upstairs on July 4th, Ruiz questioned her about a telephone number he saw on her phone. He dialed the number and gave the phone to Marquez, telling her to have a normal conversation. She said into the phone, "Hi, Carlos. This is Lydia. This is Jimmy's wife." Ruiz jumped up, pulled a knife from his pocket, and said, "You played me, bitch." He put the knife against her lower right abdomen and said if she made any noise he would stick her. Marquez opened the door to Ruiz's mother's apartment and yelled for help. Ruiz grabbed her as she opened the door, preventing her from entering the apartment and scratching her. He said, "Shut up, bitch" and "If my mother comes out, I'll stick you, bitch." She begged him not to hurt her and he again told her, "Shut up, bitch." He said, "If the cops come, I'm going to stick you." She considered throwing herself down the stairs to get away from him but instead decided to hug him to calm him down. He said, "It's over, bitch, and you played me." She told him "no" and said she loved him.

She said she needed to use the bathroom and went into the apartment. She saw that his mother's bedroom door was closed although it had been open when she had looked inside before. She went into the bathroom then returned to Ruiz and the two of them went downstairs to Marquez's car.

3

They got into her car, and the girls noticed their mother looked nervous; her eyes were watery. They drove to Marquez's house. While Ruiz stayed in the car, Marquez and the girls went into the house. Marquez told her 24-year-old son, Ricky, that Ruiz had almost killed her, and began crying. Marquez told other members of her family what had happened and someone called the police.

Marquez's mother and her sister Maria went to Marquez's car and Maria told Ruiz to get out of her sister's car. Ruiz said he was waiting for Marquez. Maria said, "You think you can come and pull a knife on my sister? Get the fuck out of my sister's car." Ruiz said he did not know what she was talking about. Marquez's mother tried to take the keys from Ruiz and he grabbed her hand. Maria demanded he let go. Just then the police arrived.

Marquez told the police that Ruiz had a knife in his pocket. She did not know if the police ever recovered a knife. The police placed Ruiz under arrest. Marquez had bruises and scratches on her neck and under her arms where Ruiz had grabbed her. She had a cut behind her ear from Ruiz's knife.

Ruiz called Marquez from jail several times. He told Marquez to file a complaint against the police for visiting their daughter's school to question her about the incident. Marquez feared that her children might be removed from her custody. Ruiz told Marquez more than once to take her daughters and hide at a house in Twentynine Palms until the case was over. He told her to hide to avoid being served with a subpoena and she responded by taking her children to a restaurant; detectives found her there and served her with the subpoena. Ruiz said Marquez should refuse to allow her daughters to talk to the police and to convey to her mother that she should tell the police she had nothing to say. Ruiz told her to tell the police he had only grabbed her and that she had caused her own injuries. She had indeed told the police that she injured herself. She told Ruiz that they did not believe her. Ruiz said that he did not want to be hurt anymore and if she did what he asked of her he would be released. Marquez visited Ruiz in jail a few times along with her daughters. She also wrote letters to him.

4

Marquez testified that she had lied at the preliminary hearing by saying that she had inflicted her own wounds and that she did not see Ruiz holding a knife. She lied because she was afraid of Ruiz.

In 1996, when Ruiz and Marquez were living separately and Ruiz had their infant daughter in his custody, Marquez had reported to the police that Ruiz had attacked her. The police arrested him and returned their daughter to Marquez.

Marquez's sister Maria testified in the current proceedings with regard to the dispute that occurred in 1996. She was at the courthouse with Marquez and saw Ruiz getting close to Marquez and using foul language. She intervened and Ruiz cursed at her and spat in her face. A deputy sheriff separated Ruiz from the women.

### B.  Prior Acts Evidence

Annie Mariscal testified that she has two children fathered by Ruiz. She met him through a dating service in 2004; he did not tell her that he was already married and had a child.

In November 2006, Mariscal lived with her father, Hipolito Mariscal (Hipolito), and her three children. She was pregnant with Ruiz's child for the second time. She awoke early one morning and found Ruiz in her apartment. Her father was not at home and Mariscal did not know how Ruiz got into her apartment. Ruiz slapped her and said, "You didn't expect me to see you, you stupid bitch." He took her to the kitchen and took a knife from a drawer, saying, "I should kill you right here." He grabbed her by the hair and forced her into the den. He told her to get the children out of the room because they should not see what he was going to do to her. She told the children to watch television.

Ruiz took Mariscal into her room and looked through her telephone bills and put her wallet in his pocket. He was looking for telephone numbers, seemingly to find evidence that she was cheating on him with another man. He wanted her to call the telephone numbers so he could find out who she was talking to. He pocketed the

telephone bill then slapped her several times and threw her on the floor.[3] He touched her cheek with the knife and drew blood, then threw her on the bed. He sat astride her and stabbed the bed with the knife six or seven times.

Ruiz remained in Mariscal's apartment for about 12 hours. Mariscal made both breakfast and lunch for everyone and each time everyone sat down to eat. Ruiz did not keep the knife with him the entire time. At around 6:00 p.m., Ruiz left when Mariscal's father returned home. Mariscal showed her father her injuries—her face was swollen and she had bruises on her stomach—and her father called the police. The police arrived and took photographs of the holes in Mariscal's mattress but they did not mention the damage to the mattress in the report regarding the incident.

The following day Ruiz telephoned Mariscal and said he wanted to work things out. He asked her not to press charges but she followed through with the case against him.

When Hipolito (Mariscal's father) returned home on the day of the incident he saw a drop of blood on the refrigerator and bruises on Mariscal's cheek and by her ear. Her face was swollen and she had a cut on the right side of her jaw near her ear. She had several large bruises on her stomach. He also saw three or four holes in Mariscal's mattress. Shortly thereafter, Ruiz told Hipolito that he was going to kill him and his daughter. Hipolito was frightened and thought Ruiz would follow through with his threat.

Hipolito had once accused Ruiz of taking about $800 from him. He later realized that his daughter had taken the money.

## II. Defense Evidence

Marquez's mother, Maria del Carmen Sanchez de Marquez (Maria del Carmen), testified that on July 4, 2011, when she and Maria went to the car to see Ruiz he did not attempt to drive away. Maria del Carmen said Ruiz had threatened her and her children.

---

**3**      Mariscal referred to as both a telephone bill and telephone bills.

6

About seven years before, Ruiz drove his car into her car, causing her to swerve. On another occasion he used his fingers to pantomime shooting at her and Marquez.

Ruiz's mother, Irene Arredondo, said on July 4, 2011, she saw Marquez at her apartment. Arredondo heard the door open and saw Marquez, who was giggling. Arredondo never heard Marquez yell for help. She looked through the peephole at one point and saw Marquez and Ruiz standing there. She did not see any kind of weapon. Marquez was holding a cell phone.

Arredondo said that years before Marquez had asked Arredondo to accompany her to the Van Nuys courthouse for support after Marquez had accused Ruiz of hitting her. Marquez recanted, however, saying that Ruiz had not touched her and she only accused him of doing so because she was angry with him.

Arredondo said that 16 years before she had seen Marquez hit herself. Marquez was crying and hit herself in the face and head with a telephone.

Ruiz testified that on July 4, 2011, he did not have a knife and did not pull a knife on Marquez. He did not threaten to stick her, stab her, or kill her. He said he did not hit, pull, punch, or scratch her. When he was standing on the stairs with Marquez he had both her cell phone and his own in his hands.

Ruiz said the girls wanted to go to their uncle's house and Ruiz told Marquez to take them, but Marquez wanted to do something with the girls and Ruiz. Ruiz told her he would give her a kiss and go upstairs and she could visit him later. He started up the stairs but she followed him and did not want to leave. Ruiz said he had learned she was texting someone and therefore he did not want to be with her. He dialed a number on her cell phone and put the call on the speaker phone so he could find out whose number it was. When the person answered, Marquez said, "Yes. This is Jimmy's wife." Ruiz felt that confirmed his suspicion about Marquez. He got upset, called her abusive names, and accused her of "playing" him. Ruiz said Marquez began to panic and when she panics she scratches herself. He grabbed her to stop her from scratching herself, but continued telling her that it was over. Marquez asked him to give her a chance and said they should just go.

Marquez needed to use the bathroom so they went into the apartment. When she finished they went down to the car and drove to her mother's house so she could get money to buy a new battery for the car.

Ruiz said Marquez visited him in jail and wrote him letters saying she loves him and they were meant to be together. They spoke on the telephone as well. She mentioned to him that the police wanted to talk to her sister and mother and said she did not want to cause them problems. Ruiz said he told Marquez they were not required to speak to the detectives. He denied saying that they could not speak to the detectives. During another conversation she told him that detectives had taken the girls out of school to talk to them without her consent; she sounded panicked when she told him. Ruiz also testified that he merely suggested Marquez and the girls go visit his son in Twentynine Palms because they get along well with his son. He told Marquez she should tell the truth when she testified.

Regarding Marquez's report to the police in 1996 that he had hit her, Ruiz said that they had been arguing frequently and Marquez wanted to go live with her mother. Their daughter was six months old at the time. They drove to her mother's house and she got out of the car to speak to her mother. When she returned to the car she said she was going to stay there. Ruiz responded that she was not going to keep his daughter from him and drove away. The daughter lived with him for about one month and Marquez would come to visit. He was then arrested and placed in custody. After their daughter was returned to Marquez's custody he was released.

In 1994, Ruiz told Marquez he wanted to be with someone else and they argued. She paged him later that night and he went to see her and saw that she had a black eye. He thought one of her brothers had given her the black eye and said he was going to go see her brother. She then admitted that she had caused the black eye herself. Ruiz said that her family always thought he had given her the black eye and have disliked him because of that.

Ruiz denied ever threatening Marquez's family members, pretending to point a gun at her mother, crashing into her mother's car, or spitting in her sister Maria's face.

8

Regarding Mariscal, Ruiz admitted he went to court because of accusations she made against him. He said they had had an argument because he told her that her baby was not his. She slapped him and he pushed her. He denied holding a knife to her face. Ruiz said that a jury convicted him of misdemeanor battery for pushing Mariscal. He was not convicted of using a knife on her, hitting her, stealing anything from her, or false imprisonment.

Ruiz said he never threatened Hipolito. When Hipolito accused Ruiz of stealing from him Hipolito took out a rifle. Hipolito also took out a rifle when he caught Ruiz and Mariscal having sex.

Ruiz acknowledged that he was convicted of possession of a firearm by a felon in 1991, of giving false identification to a police officer in 1997, of receiving stolen property in 1998, and of attempted carjacking and dissuading a witness in 2005.

## DISCUSSION

I.  **The Trial Court Proceedings Relevant to Ruiz's Contentions of *Marsden* Error and Denial of Request for Self-representation**

Two days after the jury trial commenced, Ruiz asked to speak to the court. Defense counsel told the court, "[A]s I have indicated to the court, Mr. Ruiz is progressively becoming more suspicious of everything I do. Perhaps the court . . . would like to know what I advised him." Ruiz interrupted his counsel, saying, "I want to speak, and I want it on the record." The court reminded Ruiz that everything he said on the record could be used against him. Ruiz said, "I've asked my attorney to ask the witnesses certain questions, and he's not doing it. I'm asking him certain questions that are not being asked." The prosecutor asked if he should be excused and the court agreed.

Ruiz told the court he wanted to subpoena a witness "who might be a witness that does not want to come, so a hostile witness, I guess. It's . . . not hard to find this witness and has to do a lot with my case. He still hasn't done it. I asked him months ago. And I asked my daughter certain questions that are not being asked. I understand — this

9

shouldn't be rushed. This is my life on the line and shouldn't be rushed while he's asking questions of my daughter." The court replied, "[T]here is nothing rushed about this. I have to say that after speaking with you, at least half of the questions that [defense counsel] asked were objectionable and the People didn't object. On at least one occasion, the answer did not go well. You have the benefit, Mr. Ruiz . . . I don't know how much experience you have had with attorneys and so forth. But you are extraordinarily fortunate. You have the benefit of one of the best public defenders in the county. He is an attorney and he knows what's going to happen when he does or when you ask him to do things. I guarantee you that he's not going to do it because there's too great a chance that it is going to go badly. I'm not sure that you appreciate the force of his advocacy on your behalf. On occasion, it has been fairly close to the line of what is not proper. I'm not entirely sure where this desire to insert your own thoughts or your questions into that comes from." The court then asked Ruiz if he was a lawyer and he said he was not.

The court continued: "You have a lawyer. You are incredibly fortunate to have that lawyer because he's far beyond competent, and he's trying to advocate on your behalf. Like I say, at least one of the questions he asked after speaking with you got an answer that was not helpful to you, at least in my view. I'm not the trier of fact here. So I would suggest that you do as you've been doing and participate in the case. I'm sure you have insights that he doesn't have. But when he decides not to ask something that you want asked or decides not to aggressively subpoena someone that you might want to subpoena, I want you to actually listen to what he must be telling you about why he is or isn't doing something." The court further stated, "Your relationship with your attorney is what it is. But all I can tell you is that your attorney, throughout this case, has been a ferocious advocate on your behalf. And you are being well-represented."

Ruiz then asked the court, "What about if I want to go pro per right now and defend myself?" The court asked, "Are you making that motion?" Ruiz replied, "Can I verbally say it?" The court again asked, "Are you making a motion to represent yourself?" He responded, "My attorney is not asking the right questions. I asked him a couple questions to ask the witness —" The court interjected, " Are you not hearing

10

anything I'm saying?" Ruiz said he was hearing the court. The court continued, "He did ask some of the questions that I heard you ask him to say. And at least one of them was not appropriate. So are you making a motion to represent yourself?" Ruiz said, "I asked him and he didn't ask the questions I asked him to ask the witness." The court asked again, "Mr. Ruiz, are you making a motion to represent yourself?" He replied, "Yes, I am." The court responded, "That motion is untimely, and it's denied." Ruiz asked, "How can I get the witness I want on my behalf? How can I get the subpoena? I want him to find the subpoena —" The court replied, "Sir, again, you are now asking me to make a judgment about a hostile witness that your attorney, one of the best in the county, has decided is not in your interests to bring to court. That makes no sense, sir." The court then called a recess.

Later that day, as defense counsel was questioning Marquez and the court indicated it was time to recess for the day, Ruiz said he wanted to ask a question. The court said, "No, sir. Please." Ruiz continued, "My attorney is not doing this —" The court said, "Mr. Ruiz, stop, please," and then told the jury they were going to stop for the day.

Shortly thereafter as counsel discussed the need for an interpreter on the next court day, Ruiz asked the court if he could speak. The court said he could not. After Ruiz left the courtroom, the court asked defense counsel if he had any insight as to what Ruiz wanted. Defense counsel responded that he wanted to go pro per; counsel said he imagined that Ruiz was "unhappy with the case and the state of the case which most surprised him. At leas[t]. . . . To me, it is not a surprise. I don't know why he believes that. Perhaps he thought that his phone calls that [the prosecutor] alluded to and she'd go to Twentynine Palms. I believe he's going to try to do some things in front of the jury like he did today." The court responded that it would give Ruiz an opportunity to "air it out," but not that day. The court said, "A *Faretta*[4] motion is not timely, but I need to try to avoid a mistrial."

---

**4**     *Faretta v. California* (1975) 422 U.S. 806.

When court reconvened, defense counsel made a motion for a mistrial saying that Ruiz's "outburst" might prejudice the jury. The court denied the motion, stating that it did not think there was any prejudice. "Mr. Ruiz said he simply wanted to ask a question, which isn't permissible when a defendant is represented by counsel. If you want, I can instruct the jury at the appropriate time as to that. But there is no basis for a mistrial, and the motion is denied."

## II. *Marsden* **Error**

Ruiz contends that the trial court prejudicially erred by failing to comply with the requirements set forth in *Marsden* by adequately questioning Ruiz about his dissatisfaction with his counsel and by failing to hear from defense counsel about his reasons for making the decisions with which Ruiz was dissatisfied. Ruiz contends the error resulted in a violation of his rights to due process and to the effective assistance of counsel. We agree.

"The governing legal principles [derived from *Marsden*, *supra*,] are well settled. 'Under the Sixth Amendment right to assistance of counsel, ""[a] defendant is entitled to [substitute another appointed attorney] if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result."" [Citation.] Furthermore, ""[w]hen a defendant seeks to discharge appointed counsel and substitute another attorney, and asserts inadequate representation, *the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance.*"" [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 95, italics added; see also *People v. Smith* (2003) 30 Cal.4th 581, 604.) If the defendant states facts sufficient to raise a question about his counsel's effectiveness, the court must question counsel as necessary to ascertain their veracity. (*People v. Mendez* (2008) 161 Cal.App.4th 1362, disapproved on other grounds in *People v. Sanchez* (2011) 53 Cal.4th 80, 90, fn. 3 (*Sanchez*).)

12

In the recent *Sanchez* case, the California Supreme Court reviewed the *Marsden* hearing rule and an array of its decisions interpreting the rule. The *Sanchez* court reaffirmed that if a defendant requests substitute counsel the trial court must conduct a *Marsden* hearing during which the court gives the defendant an opportunity to state *with specificity* any grounds for dissatisfaction with current counsel. (*Sanchez*, *supra*, 53 Cal.4th at pp. 84, 89-90.)

Here, the trial court permitted Ruiz to state in only brief, general terms his complaint that defense counsel had not subpoenaed a potentially hostile witness to testify. The identity of that witness and the anticipated substance of the witness's testimony remain a mystery. Because the trial court did not inquire further, it could not have known the substance of the testimony of the witness Ruiz claimed would support his defense. The court also did not invite or permit Ruiz to state on the record what questions he wanted his counsel to ask. The court said it had heard *some* of the questions Ruiz told his attorney to ask and noted that *some* of those questions were improper or not helpful, but the court did not state on the record what the questions were and we cannot ascertain from the record what those questions were. It is therefore impossible to determine whether Ruiz's defense suffered as a consequence of counsel's decision not to subpoena the witness, and it is also impossible to judge whether Ruiz's relationship with his counsel had been seriously impaired. Ruiz clearly voiced dissatisfaction with his attorney's choices but no further inquiry was made as to the state of the attorney-client relationship.

We generally review a trial court's decision denying a *Marsden* motion to relieve appointed counsel under the abuse of discretion standard. (*People v. Taylor* (2010) 48 Cal.4th 574, 599; *People v. Cole* (2004) 33 Cal.4th 1158, 1190.) The defendant must show that the failure to replace counsel would substantially impair the defendant's right to assistance of counsel. (*People v. Valdez*, *supra*, 32 Cal.4th at p. 95; *People v. Smith*, *supra*, 30 Cal.4th at p. 604.) A denial of a motion under *Marsden* does not require reversal if the record shows that the error was harmless beyond a reasonable doubt. (*People v. Chavez* (1980) 26 Cal.3d 334, 348-349.)

However, as the high court stated in *Sanchez*: "[W]e held in *Marsden* that it was prejudicial error to deny the defendant the opportunity to explain the basis for his claim because a trial court that 'denies a motion for substitution of attorneys solely on the basis of [its] courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of [its] discretion to determine the competency of the attorney' (*Marsden*, *supra*, 2 Cal.3d at p. 124), and, in that case, we could not 'conclude beyond a reasonable doubt that this denial of the effective assistance of counsel did not contribute to the defendant's conviction.' (*Id.* at p. 126.)" (*Sanchez*, *supra*, 53 Cal.4th at p. 92.) Similarly here, because the trial court did not adequately inquire into the substance of Ruiz's dissatisfaction with counsel, we cannot conclude beyond a reasonable doubt that counsel's performance did not contribute to Ruiz's conviction.

In *Sanchez*, the Supreme Court approved of the Court of Appeal's disposition which "reversed the judgment of the trial court and remanded the matter to that court with the following directions: '(1) the court shall hold a hearing on [defendant]'s *Marsden* motion concerning his representation by the public defender's office; (2) if the court finds that [defendant] has shown that a failure to replace his appointed attorney would substantially impair his right to assistance of counsel, the court shall appoint new counsel to represent him and shall entertain such applications as newly appointed counsel may make; and (3) if newly appointed counsel makes no motions, any motions made are denied, or [defendant]'s *Marsden* motion is denied, the court shall reinstate the judgment.' We believe this is the proper disposition." (*Sanchez*, *supra*, 53 Cal.4th at pp. 92-93.) We therefore reverse the judgment of the trial court and remand the matter to the trial court with the directions detailed here.

## III.   Denial of Ruiz's Midtrial Request for Self-representation

Ruiz further contends that the trial court made an inadequate inquiry into Ruiz's request to represent himself and subsequently abused its discretion by denying his request.[5]  We disagree.

"[T]he United States Supreme Court has held that a defendant in a state criminal trial has a federal constitutional right to represent himself without counsel if he voluntarily and intelligently elects to do so.  (*Faretta v. California*, *supra*, 422 U.S. 806.) . . . [However,] when a defendant has elected to proceed to trial represented by counsel and the trial has commenced, it is thereafter within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed *pro se*." (*People v. Windham* (1977) 19 Cal.3d 121, 124 (*Windham*).)

In accordance with *Faretta*, a defendant has an unconditional constitutional right to self-representation only if the motion is unequivocal, voluntarily and intelligently made, and asserted in a timely manner prior to the commencement of trial.  (*Windham*, *supra*, 19 Cal.3d at pp. 127-128.)  "However, once a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the defense himself shall be addressed to the sound discretion of the court.  When such a midtrial request for self-representation is presented the trial court shall inquire *sua sponte* into the specific factors underlying the request thereby ensuring a meaningful record in the event that appellate review is later required.  Among other factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.  Having established a record based on

---

[5]   Despite our reversal of the judgment due to *Marsden* error, we proceed to consider the remaining contentions on appeal in the event that upon remand:  (1) the trial court, after proper inquiry, denies Ruiz's *Marsden* motion; or (2) if substitute counsel is appointed, he or she either fails to file any motions or files unsuccessful motions.

such relevant considerations, the court should then exercise its discretion and rule on the defendant's request." (*Id.* at pp. 128-129, fn. omitted.)

Here the trial court, upon hearing Ruiz's unequivocal request to represent himself, immediately denied the motion as untimely without further inquiry. However, the request and summary denial came toward the end of the discussion between Ruiz, his counsel, and the court regarding Ruiz's dissatisfaction with defense counsel. The considerations relevant to Ruiz's request to represent himself are therefore apparent from the record.

As to the remaining factors, Ruiz had not previously sought to represent himself. The reason for the request, made two days after trial had commenced, was apparent: Ruiz disagreed with counsel's decisions not to ask certain questions and his assertion that the testimony of an unidentified witness was vital to his defense. Although on appeal Ruiz contends he would have been ready to proceed immediately, it is obvious that he would have requested a delay in the proceedings to permit him to subpoena that witness. Immediately upon the court denying his request to represent himself he continued to ask how he could get the witness to appear and testify. Granting Ruiz's request to represent himself would have likely delayed the trial to permit Ruiz to attempt to subpoena the witness and to recall witnesses whose testimony had already concluded. We conclude the trial court did not abuse its discretion in denying the request for self-representation.

## IV.    Other Crimes Evidence

Ruiz further contends that the trial court prejudicially erred and violated his right to due process by admitting evidence of prior domestic violence against Mariscal over defense counsel's objection pursuant to Evidence Code section 352. We disagree.

Although evidence that a defendant has committed a prior crime other than the charged offense is generally inadmissible to prove his or her conduct on a specified occasion (Evid. Code, § 1101), a defendant's prior acts of domestic violence are made admissible by Evidence Code section 1109 to prove propensity to commit a charged domestic violence offense if the evidence is not inadmissible under section 352. (*People*

16

*v. Hoover* (2000) 77 Cal.App.4th 1020, 1027-1028.)  In addition, Evidence Code section 1101, subdivision (b) also permits the admission of evidence that a person committed a crime or other act "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act."

"Under Evidence Code section 352, the court has discretion to exclude relevant evidence '"if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."'  (*Robinson v. Grossman* (1997) 57 Cal.App.4th 634, 647.)  '"The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.  In applying section 352, 'prejudicial' is not synonymous with 'damaging.'"'  (*People v. Bolin* (1998) 18 Cal.4th 297, 320.)  Relevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts, and whether the defendant had already been convicted and punished for the prior offense(s).  (See *People v. Poplar* (1999) 70 Cal.App.4th 1129, 1139; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315.)"  (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)

The trial court was vested with broad discretion in determining whether the evidence was properly admissible under Evidence Code section 352, and we will not interfere with the court's exercise of its discretion absent a showing that the ruling was arbitrary, capricious, or patently absurd.  (*People v. Callahan* (1999) 74 Cal.App.4th 356, 367.)

There are marked similarities between the prior incident involving Mariscal and the charged offense, making evidence of the prior acts highly relevant.  In both situations, Ruiz expressed jealousy and anger because he suspected the victims were having telephone conversations with other men.  He reacted by insisting the women call the

17

telephone numbers he suspected belonged to the other men, and by physically controlling the victims and threatening them with knives. The evidence of the prior crime, which was so similar to the current crime as to amount to a "pattern," helped explain that Marquez's reluctance to testify against Ruiz was not because the current incident did not happen, but because she was afraid of Ruiz. In addition, the prior incident was fairly recent, occurring in 2006.

That the incident with Mariscal lasted longer and that her injuries were more serious is more a factor of his cornering Mariscal in her home, while he confronted Marquez outside his apartment, knowing Lydia and Danielle were waiting in the car downstairs. We find that introduction of the evidence was not unduly prejudicial, as the prior incident was not overly inflammatory or likely to lead to confusion on the part of the jury. As the trial court concluded, the evidence was more probative than prejudicial.

Finally, although Ruiz was only convicted of a misdemeanor battery in the prior incident, he was in fact convicted. In any event, the jury here was able to assess the credibility of the witnesses themselves. The prosecutor's reference during closing argument to Ruiz "beat[ing] the rap," though of questionable propriety, did not prejudice Ruiz. The prosecutor made the statement in the context of explaining why Marquez and her family did not report each violent or threatening act by Ruiz to the police. The prosecutor noted the Marquez family had gone to the police several times but "[i]t doesn't work because he beats the system," including by "get[ting] people to recant and beat[ing] the rap." The statement was made to explain the Marquez family's response to Ruiz's conduct, including the fact Marquez had recanted, and was not phrased in a manner that invited the jury to punish Ruiz for what he had done to Mariscal because he had gotten off too lightly. The jury was properly instructed as to the limited purpose for which it could consider the evidence regarding the past incident, and we presume the jurors followed their instructions.

Furthermore, the evidence of Ruiz's guilt in the present case was strong. Marquez testified that Ruiz pointed a knife at her stomach and inflicted scratches, cuts, and bruises on her neck, under her arms, and behind her ear. Danielle and Lydia heard their mother

18

yell for help and Danielle saw Ruiz's hands on her mother's shoulders as her mother cried and asked Ruiz not to hurt her. Marquez looked upset as they drove back to her house and reported Ruiz's violence to family members as soon as she was out of his presence. The police were called immediately.

The admission of relevant evidence does not offend a defendant's federal constitutional right to due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair. (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.) The Mariscal evidence was not unduly prejudicial and by no means rendered the trial fundamentally unfair. Furthermore, we disagree with Ruiz's contention that had the jury not heard the testimony of Mariscal and her father, as well as the prosecutor's statement that Ruiz keeps beating the rap, the result of the trial would likely have been different, whether judged by the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, or the one set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836.

## V. Instructional Error

Finally, Ruiz contends that the trial court instructed the jury in a manner that gave the impression that the court had found, as a matter of law, that Ruiz had a motive to commit the charged offenses. Although the court orally misstated an instruction, the error did not mislead the jury. In context, the court was not telling the jury that Ruiz had a motive. Any perceived error was mitigated by the fact that the court corrected the error later and provided the jury with the correct written instructions.

### A. *Relevant Background*

The court instructed the jury pursuant to CALCRIM No. 370 as follows: "The People are not required to prove that the defendant had a motive to commit any of the crimes — crimes charged. In reaching your verdict, you may, however, consider whether the defendant had a motive. Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

19

The court further stated to the jury: "If you conclude that a defendant discouraged someone from testifying, you may consider that conduct only against that defendant — strike that last sentence. *The defendant had a motive to commit the offenses charged in this case* — let me just say that differently. *The defendant had a motive to commit the charges in this case.* In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and acts and the charged offenses. Do not consider this evidence for any other purpose except for the limited purpose as stated in this instruction. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crimes. If you conclude that the defendant committed the uncharged offenses or acts, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charges or the crimes charged in this case. The People must still prove each charge beyond a reasonable doubt." (Italics added.)

Realizing its error, the court stated to the attorneys out of the jury's presence that initially it did not have the first page of CALCRIM No. 375 and that it would have to reread that instruction.

The following day the court resumed reading the instructions to the jury. The court reread CALCRIM No. 375 in full, including the following: "If you decide that the defendant committed the uncharged offenses or acts, you may but are not required to consider that evidence for the limited purpose of deciding whether or not the defendant acted with the intent to commit the crimes alleged in this case; *whether or not the defendant had a motive to commit the offenses in this case.* In evaluating the evidence in this case, consider the similarity or lack of similarity between the uncharged offenses and acts and the charged offenses. Do not consider this evidence for any other purpose except for the limited purpose as stated in this instruction. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crimes. If you conclude that the defendant committed the uncharged offenses or acts, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself

20

to prove that the defendant is guilty of the crimes charged in this case.  The People must still prove each charge beyond a reasonable doubt."  (Italics added.)

### B.     Analysis

Ruiz contends on appeal that this error relieved the prosecution of the burden of proving each element of the charged offense beyond a reasonable doubt and violated his due process rights under the United States and California Constitutions.  He contends reversal is required because it cannot be shown the error was harmless beyond a reasonable doubt and that the guilty verdict was surely unattributable to the error.  We conclude that the trial court committed no reversible error.

It was perhaps apparent to the jury that the court had misspoken because of the stumbling manner in which the court stated the faulty instruction, saying, "strike that last sentence" and "let me just say that differently" before and after the misstated sentence.  In any event, the proper instruction was given to the jury in written form.  "The risk of a discrepancy between the orally delivered and the written instructions exists in every trial, and verdicts are not undermined by the mere fact the trial court misspoke.  'We of course presume "that jurors understand and follow the court's instructions." [Citation.]  This presumption includes the written instructions.  [Citation.]  To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.'  (*People v. Wilson* [(2008)] 44 Cal.4th [758,] 803.)  Because the jury was given the correctly worded instructions in written form and instructed with [now CALCRIM No. 200], and because on appeal we give precedence to the written instructions, we find no reversible error.  (See also *People v. Mungia* (2008) 44 Cal.4th 1101, 1132-1133; *People v. Box* (2000) 23 Cal.4th 1153, 1212.)"  (*People v. Mills* (2010) 48 Cal.4th 158, 200-201, fns. omitted.)

## DISPOSITION

The judgment is conditionally reversed and the matter remanded with the following directions: (1) the trial court shall hold a hearing on Ruiz's *Marsden* motion concerning his representation by defense counsel; (2) if the court finds Ruiz has shown that a failure to replace his appointed attorney would substantially impair his right to assistance of counsel, the court shall appoint new counsel to represent him for all purposes and shall entertain such applications as newly-appointed counsel may make; and (3) if newly-appointed counsel makes no motions, or any motions made are denied, or Ruiz's *Marsden* motion is denied, the court shall reinstate the judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


SUZUKAWA, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.